AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAR 09 2020
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Black LG
Seized as FP&F No. 2020565800006403
("Target Device")

Case No. 20MJ1052

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Transport Illegal Aliens(a)(1)(A)(ii) and (v)(II) |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Giancarlo Lugo, Border Patrol Agent, U.S. Border Patrol
Printed name and title

Sworn to before me and signed in my presence.

Date: 3/9/2020

_____
Judge's signature

City and state: San Diego, California

The Honorable Allison H. Goddard, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

>Black LG smart phone
>Seized as FP&F No. 2020565800006403
>("**Target Device**")

the ("**Target Device**"), as further described in Attachment(s) A, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant(s) relate(s) to the investigation and prosecution of Mariano AGUIRRE for transportation of illegal aliens within the United States. The **Target Device(s)** is/are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2008, and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for ten years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle

aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.  The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media,

3

or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

4

   c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

   f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On March 5, 2020, Border Patrol Agent G. Richards was conducting assigned duties in the Imperial Beach Border Patrol Station's area of responsibility. At approximately 11:09 PM, while monitoring his service radio, Agent Richards heard that an Air Marine Operations (AMO) pilot had detected a jet ski traveling north of the Imperial Beach Pier. The AMO pilot further notified that he observed two individuals disembarked from the Jet Ski, and ran into an awaiting vehicle. The AMO pilot then continue to monitor the vehicle as it left the area. Agent Richard then responded to the area where the vehicle was traveling and conducted a vehicle stop approximately three miles west of the San Ysidro, California Port of Entry, and approximately six miles north of the United Stated/Mexico International Boundary. Agent Richard approached the vehicle from the

5

passenger side, while Border Patrol Agent D. Bowden, who also responded to the vehicle stop approached the vehicle from the driver side. Agent Richard identified himself as Border Patrol Agent and conducted an immigration inspection on all subjects. The driver, later identified as defendant Mariano AGUIRRE and the front seat passenger, later identified as defendant Jose Alfredo FLORES-Garcia stated they are United Stated States citizens. The two rear passengers, later identified as material witnesses Leonel FARIAS-Ochoa, and V.M.V.A (a juvenile) stated they are citizens of Mexico, without any immigration documents allowing them to enter or remain in the United States legally. At approximately 11:23 PM, Agent Richards placed the front seat passenger FLORES, and the two rear passengers, material witnesses FARIAS, and V.M.V.A., under arrest. At approximately 11:23 PM, Agent Bowden placed the driver, AGUIRRE, under arrest.

12. While agents were completing an inventory search of the vehicle AGUIRE was driving they discovered a Black LG smart phone (**"Target Device"**) on the center console. During the interview of AGUIRE he confirmed that the Black LG smart phone (**"Target Device"**) is his.

13. The defendant Mariano AGUIRRE was read his Miranda Rights. AGUIRRE understood and was willing to speak without an attorney present. AGUIRRE stated that he was the driver of the vehicle in which he was arrested and that he recently met the passenger, Jose Alfredo FLORES-Garcia, at a restaurant in South Central Los Angeles, California.

14. The defendant Jose Alfredo FLORES-Garcia was read his Miranda Rights. FLORES understood his rights and was willing to speak without an attorney present. FLORES stated that he was contacted by a friend and was offered $1,000 USD for smuggling two individuals from San Diego, California to Los Angeles, California. FLORES stated that he left Los Angeles, California with another individual, later identified as Mariano AGUIRRE, who told him that once they arrived at Imperial Beach, California,

he had to walk to the beach and wait for two individuals to emerge from the beach. After waiting for a while, FLORES noticed a Jet Ski near the area drop off two individuals. FLORES stated that he directed both individuals to his car and instructed them to get in the passenger seat. FLORES stated that AGUIRRE then took the wheel and drove until they were stopped by Border Patrol Agents.

15. Material Witnesses Leonel FARIAS-Ochoa and V.M.V.A. (a juvenile) admitted to being a citizens of Mexico illegally present in the United States. FARIAS admitted that smuggling arrangements were made and that he agreed to pay $7,000 USD to be smuggled into the United States. FARIAS stated that he encountered Mariano AGUIRRE after getting of the Jet Ski. FARIAS stated that he asked AGUIRRE for a ride and he agreed. FARIAS stated that he was not going to pay AGUIRRE. V.M.V.A. stated that his uncle made smuggling arrangements for him.

## METHODOLOGY

16. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards

7

inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days from the date the warrant is signed, absent further application to this court.

## CONCLUSION

19. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

20. Because the **Target Device** was seized at the time of AGUIRRE's arrest and has been securely stored since that time, there is probable cause to believe that such

evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **February 6, 2020 through March 6, 2020.**

21. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item(s) described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Giancarlo Lugo
Border Patrol Agent

Subscribed and sworn to before me this 9th day of March, 2020.

Hon. ALLISON H. GODDARD
United States Magistrate Judge

9

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Black LG smart phone
Seized as FP&F No. 2020565800006403
("Target Device")

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone(s) described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone(s) for evidence described below. The seizure and search of the cellular telephone(s) shall follow the search methodology described in the affidavit submitted in support of the warrant(s).

The evidence to be seized from the cellular telephone(s) will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 6, 2020 through March 6, 2020**:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the Target Device; and/or

      f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.